Syllabus.

# Wytheville

## SCHROEDER v. WOODWARD AND OTHERS

June 11, 1914.

1. DEEDS—*Construction.*—For the purpose of ascertaining the intention of the parties and of construing a deed in a manner not inconsistent with the words used, the court will place itself as nearly as possible in the place of the parties when the instrument was executed, and will consider its origin and the sources of its derivation, all the attending circumstances, or the existing state of facts, the situation of the parties, and of the property or of the condition or state of things granted at the time, the state of the country, and generally all sources of inquiry naturally suggested by the description, or which may have acted upon the minds of the parties, are open to inquiry within the limits of the rules relating to parol evidence in such cases.

2. DEEDS—*Construction—Settlement for a Home—Right to Partition—Case in Judgment.*—In the case in judgment, land was conveyed to a trustee to hold for two persons during their joint lives, and, "upon the death of either or both, then the property of the one or both so dying, or enjoyed during her life, shall pass and become the property of K., subject only to be defeated by the death of K. prior to the death of the last surviving life tenant." The deed does not in terms state that the beneficiaries are to have and hold the property as a home, but all the facts in the case gathered from the deed and the evidence show that this was their intention, and the deed expressly provides that the two life tenants shall have the right to occupy, use and manage the property, and further that it is only to be rented in case "they" do not desire to occupy, use and manage it, and to be sold only upon the request of the life tenants in writing. One of the life tenants died, having devised her interest in the land to her daughter, the said K.; and K. instituted this suit praying a sale of the land for the purpose of partition.

*Held*: The deed did not establish a mere co-tenancy, but the rights of

the beneficiaries were so interwoven in the trust that there was no separate and severable interest in any of the parties during the lifetime of either of the original life-tenants, and if a court of equity should undertake to separate and sever the interests of the parties during the life time of either of the original life-tenants, the trust created by the deed would be at once destroyed. Where lands are held upon such a trust there can be no involuntary partition.

3. TRUSTS AND TRUSTEES—*Express Trust—Creation—Revocation.*—After an express trust has once been completely created and accepted, without power of revocation expressly reserved, it can only be revoked by the consent of all the parties in interest.

4. TRUSTS AND TRUSTEES—*Right to Sell or Lease Trust Lands—Statutes.*—The statutes of this State providing for the sale of lands of persons under disability recognize the inviolability of trust estates from lease or sale by providing that there shall be no such lease or sale unless it be clearly shown independently of any admission in the pleading that the interest of the beneficiaries will be promoted, and "the rights of no other person will be violated" by such lease or sale.

5. TENANTS IN COMMON—*Exclusive Possession of One—Rents.*—Where one tenant in common has had exclusive possession and enjoyment of the common property, and the parties themselves have agreed upon what they consider a fair rent and have acted upon that agreement, the rent thus agreed upon will be considered as fixed, and the agreement enforceable until circumstances are made to appear which make it proper to resort to other mode of adjustment between the co-tenants.

Appeal from a decree of the Circuit Court of Loudoun county. Decree for the complainant. Defendants appeal.

*Reversed.*

The opinion states the case.

*Moore, Barbour, Keith & McCandlish* and *Theo. W. Morris, Jr.,* for the appellants.

*E. E. Garrett,* and *J. R. H. Alexander,* for the appellees.

Cardwell, J., delivered the opinion of the court.

By deed dated the 4th day of May, 1898, Charlotte Rogers conveyed to Thomas U. Dudley, Jr., trustee, a certain parcel of land containing a little less than seven acres, improved by a large brick dwelling-house and other buildings, located at Middleburg, Loudoun county, Va., the trust being for the benefit of Fanny Dudley Woodward, wife of Henry R. Woodward, Emily Sidell Schroeder and Katharine Woodward, the daughter of said Henry R. and Fanny Dudley Woodward, the consideration named in the deed being the sum of $1,100 in addition to which $900 was used in purchasing an outstanding ground rent, thereby making the total purchase money amount to $2,000. Subsequently a further sum of $2,000 was expended in repairs and improvements to the property; Emily Sidell Schroeder contributing one-half of the original purchase money ($2,000) and one-half of the amount expended for repairs and improvements, the other one-half of both the purchase money and cost of repairs and improvements being paid by Fanny Dudley Woodward out of her separate estate.

The trust deed expressly excludes the marital rights of any present or future husband of either Fanny Dudley Woodward or Emily Sidell Schroeder, and then provides that the property conveyed shall be held by the trustee "for the said Fanny Dudley Woodward and Emily Sidell Schroeder during their joint lives, and, upon the death of either or both, then the property of the one or both so dying, or enjoyed during her life, shall pass and become the property of the said Katharine Woodward, subject only to be defeated by the death of Katharine Woodward prior to the death of the last surviving life tenant. But, in the event the said Katharine shall die before one or both of the aforesaid life tenants, then

said life-tenants shall each have power to appoint by will or by writing in the nature of a last will and testament and the portion so held for the benefit of Katharine Woodward after the death of either life tenant shall pass and go to whoever is or would be her lawful heir in case of her death before the last surviving life tenant. But, in the event the said Katharine Woodward shall become the absolute owner of this property she is to hold the same discharged of this trust.'' After repeating the former declaration, that in no event is the husband of either the beneficiaries of the deed, or party or parties taking under the same, or any future husbands, to be entitled to any rights whatever in the property conveyed by reason of their marital rights, the deed proceeds: "Said trustee shall permit said life tenants to use, occupy and manage the said property if they so desire and the proceeds arising from same, but if they don't so desire then said trustee shall rent out said property and collect proceeds, pay taxes and insurance and pay balance to said parties or their order as their rights appear.''

Finally the deed provides: "Upon the written request of the said life tenants, the said trustees shall have power and authority to sell and reinvest the proceeds in other property to be held upon the same trusts, usages, and purposes as this . . .''

For convenience, the beneficiaries in said deed will be hereafter in this opinion spoken of as Miss Schroeder, Mrs. Woodward, and her daughter as Miss Woodward.

It appears that at the date of this trust deed and long prior, the relations between Miss Schroeder and Mr. and Mrs. Woodward and their daughter, Miss Woodward, were of the most friendly and intimate nature, and that this close relation between Miss Schroeder and Mrs. Woodward continued and grew stronger until the lat-

ter's death on the 30th day of September, 1908, but the relations between Miss Schroeder and Mrs. Woodward's husband, Henry R. Woodward, subsequent to the execution of this trust deed became of a less friendly nature, and finally, as it seems, he took a strong dislike to Miss Schroeder.

Mrs. Woodward left a will, made and published in January prior to her death, by which she devised and bequeathed to her daughter, Katharine, all of her property, real, personal and mixed, but provided that in case her daughter did not survive her, the property of the testatrix, of every kind and description, should go to "my friend Em-Sidell Schroeder," and that in case neither Miss Schroeder nor the daughter of the testatrix survived her, all of her property of every description, etc., should go to "my friend Adeline Henderson," and appointed Adeline Henderson executrix of the will, to be allowed to qualify as such without security.

After the death of Mrs. Woodward, Miss Woodward remained on the trust property (christened by the parties in interest as the "Poor Farm," and so spoken of in this record) with Miss Schroeder until the house was, as usual, closed in the fall of 1908, to be opened for their joint occupancy, as before, on May 1, 1909; but Miss Woodward on February 26, 1909, wrote Miss Schroeder, addressing her as "My dear 'Brother'" (as she had been accustomed to call her), the letter being as follows:

"Now I am going to say something which is the hardest thing for me to do, and which has caused me such worry and anxiety but it has got to be done. Brother, if you come back to Virginia to open the 'Poor Farm' you will place me in a very embarrassing position, for my father is planning to come here himself to live, and you know it is best and my duty to live with him, for I

know so well that 'Dear Fanny' (her mother) wishes me to. You know perfectly well that I am bound to you by many tender bonds and memories, and I know you have been a dear and good friend to me, almost a mother, and it gives me pain to hurt you know if Fud (her father) has a home I must live with him as he had a hard time, I know, and that is what he wants and *demands.* You know, if you came down as you planned and I at the Duffey's or Dudley's it would not be very pleasant for either of us for you would not like for me to stay elsewhere and my father would not want me to be at 'The Poor Farm' so you see how much I am worried. I have no plans only I am trying my best to do the right thing and hurt nobody's feelings, and I do hope dear 'Brother' you will see how embarrassing it is for me and be kind enough to try to help me out by putting yourself in my place. Well I have said what I wanted to say for so long, at last and it is hurting me all right, but you see how life is for we must have pains as well as joys.

"I cannot write more for this has nearly finished me so only ask you to write to me as soon as you get a chance.

"With love and good night and may the Lord help you and me.

"Your loving

"FOFF."

Miss Schroeder replied to this letter from Hamilton, Bermuda, in the most affectionate manner, and after stating that she had read the letter several times said: "I find myself quite paralyzed by its contents, and I confess I hardly know what to say. You surely don't realize what you are asking, and I can't believe your folks appreciate the situation. When I put almost the last I had into the Poor Farm I felt that happiness for me there was worth much more than the actual cash, but

it was also with the thought that I at last had a home so long as I lived, and one for you afterwards. It was ours for all time. Stop a minute to think of what that meant and means to me, a wanderer most of my life. I put into it something else that has drawn compound interest when you say I have been a good friend, almost a mother to you. Of course, I'd like to have you with me as long as you care to stay, but I appreciate the fact your first duty is to your father, and its right you and he should make a home for each other, but I can't quite believe that it is necessary for me to make myself homeless to accomplish that end. No, Foff, I can't step down and out. I must have a home. Surely any one knowing the circumstances, the fact that the place is in trust for you (I have already given you my share at my death) could not expect me to do or feel otherwise. Of course the place can't be the same without you, but you must not feel in the least embarrassed by my being at the Poor farm. I stand ready as always to help you.

· "Affy Brother."

Before receiving this letter from Miss Schroeder, Miss Woodward wrote her again on March 11, 1909, and after saying that unless Miss Schroeder would rent her part of the place "to us, which to avoid trouble and bad feelings," she (Miss Woodward) would have to live with her father, asked: "How much money would you take per year for your interest in the place or how much will you give me? Give or take, and I consider this a fair proposition," concluding the letter in part with: "Of course, if you rent my part I expect to move my furniture which my father said I must, and you have the same privilege, unless you prefer to leave it there until you make some arrangements. Or I will buy your interest out, if we can agree upon terms. Please answer this at once for I am worried and sorry it had to happen." . . . .

To this letter Miss Schroeder replied, saying: "your suggestion that rent be paid by the occupant, is quite fair. I wish you'd say what you consider the right amount. As I understand the matter, I don't think either of us can sell it, so, I'd better rent the place from you indefinitely. Of course, if you want to take out your belongings that perfectly agreeable to me.  . ."

Miss Woodward replied to this letter on March 26, 1909, "I will give or take $150.00 rent per year on the 'Poor Farm' independent of the lower orchard. I want that for stock." To this letter Miss Schroeder promptly replied, saying: "I accept your proposition and will rent your interest in the P. F. at your price indefinitely . . ."

This arrangement between the parties held good and undisturbed, Miss Schroeder paying the rent agreed, until May 30, 1910, when Miss Woodward wrote her this letter:

"My dear 'Brother:'

"The Virginia law requires six months notice to a tenant, so I hereby notify you that I will want one-half possession of the Poor Farm after December 31, 1910. Our plans, that is my father's and mine are very unsettled, and we must have some place to go, and it seems to me the Poor Farm is the place, however, if you are firm in your decision not to let us have your part for a year our only alternative is to take possession of our part.  . ."

Miss Schroeder, denying the right of Miss Woodward to have partition of the property and adhering to the position which she had held through the entire controversy, that a sale of the property would destroy the provisions of the trust deed under which it was held and deprive her of her home, Miss Woodward in March, 1911, filed her original bill in this cause, to which bill Miss Schroeder, Thomas U. Dudley, Jr., trustee, and H.

33

R. Woodward were made parties defendant, alleging that partition in kind of the property in question was not practicable, and therefore a sale of it was asked. Among other things stated in the bill, it was said that there were reasons well known to the defendant why she and complainant could not occupy the property jointly, but the bill expressly refrains from stating these reasons, because, as explained, complainant did not care to relate them in a court proceeding.

The bill was formally answered by H. R. Woodward and Dudley, trustee, both of whom united in its prayer. Miss Schroeder, on June 26, 1911, filed her answer to the bill denying that there was any right in the complainant to have partition of the property, and setting forth the circumstances surrounding the parties when the property was bought: that the intention of respondent and Mrs. Woodward, who furnished the entire consideration for the conveyance to the trustee, was to obtain a home during the lives of both and each of them, so long as both or each of them desired to occupy the property as a home; that the intention of the parties furnishing the consideration was that in the event of the death of Mrs. Woodward, her daughter, Miss Woodward, should occupy the property jointly with the survivor; that respondent did not know any reasons why, as alleged by complainant, she could not occupy the property with respondent, and the answer of respondent averred that she felt for complainant the warmest feeling of affection and regard, and that the home at Middleburg (the Poor Farm) was just as it was in the lifetime of complainant's mother. Respondent's answer further pointed out and insisted that to bring about partition of the property by sale, would be grossly inequitable to respondent and of no benefit to complainant, as the trust deed under which it is held requires that when the property is sold, the

trustee shall reinvest the proceeds in other property to be held upon the same trusts as is the property now held under said trust deed. With her answer the respondent filed the letters spoken of and quoted from above, which indicated the attitude of the complainant and respondent toward each other just prior to this suit.

The first evidence in the case consisted of a deposition given by complainant on the 6th of October, 1911, the substance of which was that the Poor Farm was not susceptible to partition in kind, and that she did not desire to make a home there with respondent, but desired to live with her father, though the evidence afterwards taken in the case shows that she has not lived with her father since her mother's death. Miss Woodward was not then cross-examined and an effort then made to agree to the facts in the case being unsuccessful, she, at the January term of the court, 1912, was allowed over the objection of respondent (Miss Schroeder) to file an amended bill. This amended bill added nothing to the averments of the original bill, except the statement that respondent was "addicted to smoking cigarettes," and the use of "intoxicating liquors," and that complainant, therefore, could not occupy the Poor Farm with her, and further that complainant had undergone certain surgical operations which made it necessary that she should have a home of her own to the end that she might improve her health and regain her physical strength.

Respondent answered the amended bill and admitted that she used cigarettes, but never in public or in the presence of any one who could have objections, and stated that the greater portion of her life had been spent with people of culture and refinement, both in this country and abroad who regard the use of cigarettes and wine or other "intoxicant" liquor in moderation, either by the male or female portion of the community as

perfectly proper and harmless; that as to the use of "intoxicating" liquors, respondent's use of them was no more than is practically universal among ladies with whom she had been accustomed to associate, except of course those who absolutely abstain; that as to both the use of cigarettes, wines and intoxicants by respondent, these conditions existed at the time the Poor Farm was purchased, and Mrs. Woodward, like respondent, made moderate use of cigarettes and intoxicating liquors, and that she and respondent enjoyed the friendship and esteem of the entire community.

After the answer to the amended bill was filed, evidence was taken, including a second deposition given by Miss Woodward in which she claimed to be still fond of Miss Schroeder, but stated that she would not live with her at the Poor Farm, even though there should be a discontinuance of the use of things to which she made objection. She admitted that her mother, as did Miss Schroeder, used cigarettes and intoxicating liquors; that this condition had existed from the time of the trust deed, and that she never, prior to the filing of her amended bill, indicated the slightest objection to Miss Schroeder as to either of these matters.

B. W. Haxall, testifying for Miss Woodward, stated that the use of cigarettes and intoxicating liquors on the part of ladies would not be tolerated by the Middleburg community, and S. R. Fred, another witness for Miss Woodward, agreed with Mr. Haxall, but further stated that Miss Schroeder's social standing was excellent and had never been questioned in the Middleburg community; that he had never seen her make use of either cigarettes or liquors or had any knowledge of her use of them, although his residence was only about one and a half miles from the Poor Farm, and she had visited his home. A number of witnesses, ladies and gentlemen of

the Middleburg community, including a niece of Mr. Haxall, testified that the moderate use of cigarettes and intoxicating liquors would not affect the standing of a lady in that community, and all agreed that Miss Schroeder was held in high esteem and regard by the Middleburg people. Other witnesses for Miss Schroeder, all of whom had been her and Mrs. Woodward's mutual friends, testified generally to the good, social standing of Miss Schroeder in Louisville, Ky., her birth-place, and in the Middleburg community, to the circumstances surrounding the parties at the time of the execution of the trust deed, and the intent of the parties, to the devoted friendship existing between Miss Schroeder and Mrs. Woodward, to their love and affection for each other, and to their complete accord in their views and manner of life. Mr. L. F. Day, who has held important positions as a railroad official and had known Miss Schroeder for twenty years, spoke of her, in his deposition, as the person, above all others, whose influence he would prefer for his own daughter.

At the April and June terms, 1912, of the court, certain proceedings were had in the cause over the objection of respondent, Miss Schroeder, but not necessary to be considered in the view that we take of the case. On the 25th of October, 1912, the trial court, upon the view that the decision of the issue submitted depended upon a proper construction or interpretation of the trust deed in question, held, that the proper interpretation of said deed, ''gathered from its terms and the evidence taken by both parties to the controversy and the law applicable thereto is, that Thomas U. Dudley, trustee, now hold the title to said property in trust for the benefit of Emily Schroeder and Katherine Woodward (the mother of Katharine Woodward being dead) as follows: Emily Schroeder is entitled to a life estate in one-half un-

divided interest in the said property which cannot be increased or diminished, and, in addition, she has the power of appointment in fee as to an undivided one-half interest in the event she survives Katharine Woodward; Katharine Woodward is entitled to the share of her mother in the said property as to its use and enjoyment, together with the vested remainder in the said undivided one-half interest in the said property in the event Emily Sidell Schroeder should survive her and the remainder in the whole should she survive the said Emily Sidell Schroeder, and that during the joint lives of these parties, they are entitled to an equal share in the rents, issues, profits or other enjoyment of said property." But the court, though of opinion that a sale of the property, at that time, should not be ordered, as both parties were entitled to share equally in its enjoyment, and being also of opinion that it is impossible for them to jointly occupy the property and the two families to live in the same house agreeably, decreed that Dudley, trustee, should rent out the property at public auction for the term of one year with the privilege of three years, said election to be determined on the date of said public offering, commencing on January 1, 1913, and ending on December 31, 1915, for money rent, payable quarterly each year, and to this end the trustee is directed to advertise the property and secure the payments of the rent as directed in the decree, and out of the rent collected the trustee is directed to pay the taxes and insurance on the property and all necessary repairs thereto, and pay over the balance in equal amounts to Miss Schroeder and Miss Woodward, until the further order of the court. The decree then directs that as Miss Schroeder has had the exclusive use of the property since January 1, 1911, the cause be referred to a commissioner to ascertain and report to the court what would be a fair

amount with which Miss Schroeder should be charged for the use and occupancy of the property from January 1, 1911, to December 31, 1912.

From this decree Miss Schroeder brings the case here on appeal and assigns as error: (1) the ruling of the circuit court allowing the complainant, Miss Woodward, appellee here, to file an amended bill, after evidence had been taken in the cause, etc.; (2) in decreeing the rental of the property in question at public auction; and (3) in referring the cause to a commissioner to report what should be charged to appellant for occupancy of the property from January 1, 1911, to December 31, 1912.

Appellee assigns as cross-error, under rule VIII of this court, the refusal of the circuit court to refer the cause to a commissioner for a report as to whether or not the property was susceptible of partition in kind or whether it should be sold for the purpose of partition between the parties.

In the view that this court takes of the case, it is not necessary to consider appellant's first assignment of error, nor appellee's cross assignment, for if the trial court was without authority to direct a public rental of the property, clearly it was without authority to decree a sale thereof for the purpose of partition.

As rightly stated in the decree appealed from, a decision of the issue submitted in the cause depends on the proper construction and interpretation of the deed under which Dudley, trustee, holds the title to the property which is the subject of this controversy, to be gathered from its terms and the evidence taken by both parties to the controversy, and the law applicable thereto.

It will be observed that this trust deed, upon its face, contemplated the renting of the property *only when the parties having the right to use, occupy and manage the same requested it* —that is, of course, when both united

in the request; and that the deed contemplated that there might be a sale of the property, *but only "upon the written request of said life tenants,"* and in that case the proceeds of sale are required, by the express terms of the deed, to be held "upon the same trusts, usages and purposes" as the property sold was then held.

The status of appellant with respect to this property was not at all changed by the death of Mrs. Woodward and appellee's succession to the rights of her deceased mother in the property. With respect to the surround- ing circumstances attending the purchase of this prop- erty and its conveyance to Dudley, trustee, there is practically no conflict in the evidence.

It appears that appellant is a native of Louisville, Ky., where she grew to womanhood, and at that time had con- siderable means, and traveled extensively, having no close attachment to any locality until the purchase of the property here in question; that she had many friends, but the very closest tie which she ever formed was that existing between herself and Mrs. Woodward whom she knew from childhood, and who was a daughter of the late Bishop Dudley of Kentucky. Mrs. Woodward's mother was from the neighborhood of Middleburg, Va., and both Mrs. Woodward and appellant, who had seen the property involved in this suit upon visits to Middle- burg, had determined that of all the places they had seen and known in their wide travels, this was the most desirable to them for the establishment of a common home and this desire was finally consummated in its pur- chase, as evidenced by the deed of May 4, 1898. It fur- ther appears that H. R. Woodward, the husband of Mrs. Woodward, prior to the date of the deed, was considered a man of large means, but just a little while before the said purchase, his resources had become very much im- paired, at which time he and his family were living at

Aspen, Colorado, and appellant was on a visit to them, and while there the final determination to purchase the property at Middleburg was arrived at; it being agreed between the parties that it was very desirable that appellant, Mrs. Woodward, and her daughter should secure a home together—desirable to Mrs. Woodward and her daughter because it was necessary for Mr. Woodward to be absent from his family in his efforts to rebuild his fortune, and desirable also for appellant, who since her childhood had not had a home of her own.

Accordingly, the parties came to Virginia, and Mr. Woodward secured the services of a lawyer to draft a deed for the property (called afterwards the "Poor Farm") which would effect the purposes stated, the central thought of all parties concerned at the time being to secure a home which would be a suitable and pleasant place of abode during the lives of Mrs. Woodward and appellant, as long as they both lived, and then upon Katharine Woodward (appellee) surviving, she was to take the place of the one dying. It seems quite clear, also, from the evidence that there was never a thought in the minds of either appellant or Mrs. Woodward, who together furnished the entire consideration for the conveyance of the property to the trustee for their use, etc., and the costs of necessary repairs to the property, that the survivor of them should ever, against her consent and wish, be ousted of her right to occupy, use and enjoy the property as a home.

In this view as to the purposes of the parties in acquiring the title to the property appellee acquiesced and acted upon after the death of her mother until, not of her own volition, as she repeatedly has disclosed, but impelled by the wishes and purposes of her father, on May 30, 1910, by letter she notified appellant that it was her purpose to terminate at the end of the year a joint occu-

pancy and use of the property with appellant, and followed that notice with the institution of this suit, her original bill asserting that the purpose and intent of the deed under whch the property is held was to provide a home for Mrs. Woodward and appellant, and that upon the death of either the interest of the one so dying should pass to her. Neither in the pleadings nor in the testimony given by appellee does she show any total failure of the objects of the trust, but in her amended bill states her reason for not wishing to occupy the Poor Farm with appellant to be that appellant was "addicted to smoking cigarettes" and to the use of "intoxicating liquors," and in her deposition in the case she refers to these habits of appellant but gives as her reason for not wishing to make her home at the Poor Farm with appellant that she wanted to make her home with her father, that she might have her friends, who would be younger than those of appellant, and be rid of some of appellant's friends whom she didn't like. While the evidence shows that the use of cigarettes, wines and liquors by women, even in moderation, is not approved of by the larger portion of the people residing in the Middleburg neighborhood, it also abundantly shows that appellant has long since established herself in the affections of the people of that community, and is held in high esteem by them as well as by the people in other communities in which she has lived. When considered in the light of the evidence as to the relations existing between Mrs. Woodward and appellant up to the former's death in September, 1908, and the cordial and affectionate relations existing between appellee and appellant from that time down to the institution of this suit, the position taken by appellee now is lacking in sincerity, if it should not be regarded as frivolous and not deserving of serious consideration.

Construing and interpreting the deed in question as gathered from its terms in the light of the surrounding circumstances disclosed by the evidence in the case, the purpose and intent of the parties in purchasing the property and having it conveyed to Dudley, trustee, for their benefit, was to secure to them a home, so long as either of them lived, and at the death of the survivor the whole of the property was to go to appellee, discharged of that trust. Mrs. Woodward and appellant so construed the deed and acted upon that construction up to the death of Mrs. Woodward, a period of ten years, and appellee so construed it, or at least acted upon that construction, from her mother's death up to the date of her letter of May 30, 1910, notifying appellant that she desired possession of one-half of the property on December 31, 1910; it being her intention, evidently, that she and her father would occupy one-half of the property although the trust deed had expressly excluded her father from any right to, interest in or control over the property as the husband of Mrs. Woodward. Appellant testified in this case that it was the purpose of Mrs. Woodward and herself, by agreement, to provide a home that could not be taken from them so long as either of them lived, and that the deed which would be drawn ''would tie up things forever,'' and ''it was all done with Mr. Woodward's consent.'' She further states that she and Mrs. Woodward ''desired to have a home always together so long as they lived, and a home for Katharine (appellee) afterwards. No matter what happened that at least was safe. Mr. Woodward seemed very glad that we should all have this home so that when he wished to come there he could, and he did, and Mrs. Woodward, who wasn't very well, had a permanent place to stay.''

That it is proper in construing this deed to consider its general purpose and scope in the light of the sur-

rounding circumstances, see *Lindsay* v. *Eckels,* 99 Va. 668, 40 S. E. 23; *Temple's Admr.* v. *Wright,* 94 Va. 338, 26 S. E. 844; *Allemong* v. *Gray's Admr.,* 92 Va. 216, 23 S. E. 298; *Perkins' Trustee* v. *Dickinson,* 3 Gratt. (44 Va.) 335.

13 Cyc. at p. 607, states that for the purpose of enabling it to ascertain the intention of the parties and to construe the deed, but not in a manner inconsistent with the words used, so as to add to or detract from or alter the intent, the court will place itself, as nearly as possible, in the place of the parties when the instrument was executed, and will consider its origin and the source of its derivation, all the attending circumstances, or the existing state of facts, the situation of the parties, and of the property or of the condition or state of things granted at the time, the state of the country, and generally all sources of inquiry naturally suggested by the description, or which may have acted upon the minds of the parties, are open to inquiry within the limits of the rules relating to parol evidence in such cases.

The trust deed here does not in terms state that the beneficiaries are to have and hold the property as a home, but all the facts in the case gathered from the deed and the evidence show that this was their intention, and this much is conceded in appellee's original bill, and the deed expressly provides that Mrs. Woodward and appellant (appellee in the event of the death of either) should have the right to occupy, use and manage the property, and further that it is only to be rented in case "they" do not desire to occupy, use and manage it, and to be sold only upon the request of the life tenants in writing. The deed, therefore, did not establish a mere co-tenancy, but the rights of the *cestuis que trustent* were so interwoven in the trust established that there was no separate and severable interest in any of the

parties interested during the lifetime of either of the original life tenants, so that when a court of equity undertakes to separate and sever the interests of the parties during the lifetime of either of the original life-tenants, the trust established by the deed is at once destroyed. While appellant, for the money that she put into the property did not get a full one-half interest in the property, she did obtain a right of life occupancy together with the power of appointment as to one-half interest in the property in the event she should survive appellee. So far as appellant is concerned, a court of equity has the power and should protect her in the enjoyment of that which she did get under the trust deed, viz., the right of life occupancy of the property with power of appointment in the event of her survivorship. Such being the intent of the parties gathered from the terms of the deed considered in the light of the surrounding circumstances, the question is presented, whether partition can be allowed where it will defeat such a trust.

In *Ogilby* v. *Hickok,* 144 App. Div. (N. Y.) 61, 128 N. Y. 860, it was held that: "A deed placing lands in trust until such time as the survivor of two beneficiaries in being at the time of the creation of the trust shall die, does not violate the statute against perpetuities, even though it provides that at the termination of the trust the lands shall be divided among the heirs of three beneficiaries named, and when lands are held under such a trust there can be no partition."

In *Owens* v. *Haughton,* 23 Pa. Super. Ct. 639, 15 Dec. Dig. 919, where a testatrix gave her real estate to a trustee to keep the house as a home for her nieces, or in the discretion of the trustee to sell it and divide the proceeds equally between such nieces, it was held that these nieces had no such estate in the property as entitled either of them to demand a partition of it.

The ruling of the court in *Peirson* v. *Van Bergen*, 53 N. Y. 390, is that where the trust, although voluntary, is an active one for lives still in existence, a sale for partition cannot be had, even on the trustee's consent, by one of the beneficiaries claiming as a remainderman.

In *Ward* v. *Ward,* 163 Mich. 570, 128 N. W. 761, 10 Key No. Series 1840, it was held that as a rule an application for partition should be denied where the estate is subject to a trust, the purpose of which would be defeated by its partition. 30 Cyc. 1, 186, and authorities cited; *Harris* v. *Larkin, &c.,* 22 Hun. 488.

The decision by this court in *Nickell* v. *Handley,* 10 Gratt. (51 Va.) 336, fully sustains the proposition that where by a trust instrument the rights of the parties are so interwoven that a severance cannot be effected without violating the trust, then the entire property must be kept intact in order to carry out the intention of the creator of the trust.

Among the decided cases in this and other jurisdictions showing with what strictness the courts have upheld the provisions of trust instruments, and that courts do not undertake administration unless the objects of the trust have been ended or all the beneficiaries consent, or there is some denial of the rights of one of the beneficiaries, is the case of *Skipwith* v. *Cunningham,* 8 Leigh (35 Va.) 271, 31 Am. Dec., 642, where it is held that a complete trust, without reservation of power of revocation, can only be revoked by consent of all the *cestuis que trustent;* that if a voluntary trust for the benefit, wholly or partially, of some person or persons other than the grantor is once perfectly ceated, and the relation of trustee and *cestuis que trustent* is once established, it will be enforced, and that such a trust once created and accepted without power of revocation expressly reserved, can only be revoked by the

consent of all the parties in interest. See also *Minot* v. *Tillon*, 64 N. H. 371, 10 Atl. 682; *Hallman* v. *McWilliams*, 70 Cal. 449, 11 Pac. 659; 1 Perry on Trusts, 104, 386-a; Same authority, 1872 ed., sec. 920; *Ewing* v. *Jones*, 15 L. R. A. 81; 2 Min. Inst. (4th ed.) p. 228.

In 39 Cyc., at p. 92, citing a number of decided cases as sustaining the text, it is said: "After an express trust has been perfectly and completely created, and the rights of the beneficiaries have thus become vested, the trust cannot be changed, altered or modified by either creditor, trustee, part of the *cestuis que trustent*, or court, except with the consent of all the beneficiaries."

It is quite true, as a general rule, that control and supervision of trusts is one of the well recognized branches of equity jurisdiction, and this jurisdiction is usually invoked to compel the performance by a trustee of some duty under the trust, or at the instance of the trustee when he desires the guidance of the court; but in the case here it is asked by the appellee who has been denied none of her rights under the trust deed in an effort to take exclusive possession of the trust estate or make a severance of it at a time and in a manner not authorized by that instrument. She is not entitled to partition of the property as is demonstrated by the authorities cited, nor was there a right in her to a sale of the property under section 2436-b of the Code under which a sale can only be ordered when there is a vested remainder and the facts alleged and proven are such as to justify the sale.

The General Assembly of Virginia recognized the inviolability of trust estates from lease or sale, unless the interests of the *cestuis que trustent* will be promoted thereby, and unless further "the rights of no person will be violated," in the chapter of the Code of 1904, commencing with section 2615; and the fact that the interest

of all will be promoted and the right of no person will be violated is required by section 2620 to be clearly shown independently of any admission in the answers of defendants to a proceeding for the purpose of having such an estate leased or sold.

There was no right in appellee to implead appellant for the administration of the trust deed; her right then and upon the presentation of her case upon the evidence adduced was simply the right to jointly occupy the property with appellant, which right appellant has never denied; but on the contrary the pleadings and evidence in the record fully sustain the contention of appellant, that she has always been and is still desirous that appellee should jointly occupy, use and enjoy the property with her, and that this was the wish of appellee's mother. Not only has appellant occupied this friendly position towards appellee, but in order to have no unpleasant incidents between herself and appellee, and although she did not believe that in law she was bound to do it, she agreed upon appellee's invitation in her letter of March 26, 1909, *supra,* to pay her $150 *per annum* rent for the property, and this rent, as above stated, appellant continued to pay until appellee decided that she would have the entire property as a home exclusively for herself and her father, and resorted to this suit as a means to accomplish that end, by either enforcing a sale of the property, or having it publicly offered for rent.

Notwithstanding this course on the part of appellee, and though she does not believe that she is chargeable with any rent so long as appellee sees fit not to occupy the property with her, appellant expresses herself in the record as still willing, if she continues to have the entire occupancy, use and enjoyment of the property, to pay appellee the $150 *per annum* which she herself fixed as

a fair compensation to her, subject, of course, to the payment of appellee's due share (one-half) of the taxes, insurance and necessary repairs to the property.

Where a tenant in common uses the property to the total or partial exclusion of his co-tenant, an accounting to such co-tenant may be had, under the statute, for so much of the rents and profits as the tenant in the possession and use may have received, or should be charged with if such possession and use has been exclusive, and the best measure of his accountability is a fair rent of the property so occupied and used by him; but where the parties themselves have agreed upon what they consider a fair rent and have, as in this case, acted on that agreement, the rent thus agreed on will be considered as fixed, and the agreement enforceable until circumstances are made to appear which make it proper to resort to other modes of adjustment between the co-tenants. 1 Minor Real Prop. sec. 922; *Paxton* v. *Gaemett,* 82 Va. 706, 1 S. E. 92.

For the foregoing reasons we are of opinion that the decree reviewed is erroneous and it will, therefore, be reversed and annulled, and this court will enter the decree the circuit court should have entered, dismissing appellee's bill, with costs to appellant.

*Reversed.*