In re A.H. ROBINS COMPANY, INCORPORATED, Debtor.

OFFICIAL DALKON SHIELD CLAIMANTS' COMMITTEE, Claimant–Appellant,

v.

Ralph R. MABEY; The Official Unsecured Creditors Committee of A.H. Robins Company, Incorporated, Parties-in-interest,

A.H. Robins Company, Incorporated, Debtor–Appellee,

The Official Committee of Equity Security Holders, Appellee.

No. 88–1753.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 6, 1988.

Decided June 16, 1989.

Stephen N. Shulman (Mark C. Ellenberg, Cadwalader, Wickersham & Taft, on brief) for claimant-appellant.

Dennis Jay Drebsky (Alesia Ranney–Marinelli, William F. Gray, Jr., Skadden, Arps, Slate, Meagher & Flom, James C. Roberts, James S. Crockett, Jr., Mays & Valentine, on brief), Ralph R. Mabey (Leboeuf, Lamb, Leiby & MaCrae, Robert M. Miller, Berlack, Israels & Liberman, on brief) for debtor-appellee.

Before RUSSELL, WIDENER and CHAPMAN, Circuit Judges.

CHAPMAN, Circuit Judge:

This is another appeal arising from the Dalkon Shield litigation that resulted in A.H. Robins Co. (Robins) seeking the protection of a Chapter 11 bankruptcy. The present appeal is by the Official Dalkon Shield Claimants' Committee and challenges the validity of certain provisions of the district court's Memorandum In Re Confirmation Order entered July 26, 1988, which confirmed the plan of reorganization of A.H. Robins Co. (Plan), 88 B.R. 742 (1988). The appellants also allege that the district court is interfering with the day-to-day operation of the Dalkon Shield Claimants' Trust (Trust) and its five Trustees, who have been appointed to administer the $2.3 billion dollar trust that has been established to pay the claims of almost 200,000 claimants, who filed claims against Robins alleging injuries from use of the Dalkon Shield.

Robins filed its bankruptcy petition on August 21, 1985 because of cash flow problems created by the cost of litigation, the payment of judgments and claims, and the

anticipated future claims and litigation concerning the Dalkon Shield. On the same day Robins filed a motion seeking to have the district court, rather than the bankruptcy court, retain certain matters arising in the bankruptcy. This motion was granted and Administrative Order No. 1 was filed on August 21, 1985. It listed the matters that would be heard originally by the district court and provided that all other matters would be heard by the bankruptcy court. The United States district judge and the United States bankruptcy judge have been sitting together and deciding together many issues arising from those matters retained.

Subsequent to August 21, 1985, a Creditors' Committee was appointed to represent general unsecured creditors. The Dalkon Shield Claimants' Committee was appointed to represent the interest of those persons asserting claims against Robins for personal injury or damages in connection with the Dalkon Shield. The Equity Security Holders' Committee was appointed to represent the interests of persons or entities holding shares of Robins' common stock.

During the efforts to reorganize under Chapter 11, Robins managed its affairs and operated its business as a debtor-in-possession under 11 U.S.C. §§ 1107 and 1108 with oversight by a court-appointed examiner. After extensive negotiations a plan of reorganization was filed on March 28, 1988. Under this plan Robins will be merged into a subsidiary of American Home Products Corporation; a Claim Resolution Facility will be created for resolution of Dalkon Shield claims; and a Claimants' Trust and an Other Claimants' Trust will be created and funded in an amount exceeding $2.3 billion to pay valid Dalkon Shield claims. Each trust is non-reversionary, and the entire corpus of each trust and all interest earned thereon will be available to pay valid Dalkon Shield claims. Each trust is charged with the obligation of evaluating each claim and determining what amount, if any, to award the claimant. Any funds remaining after all claims are paid will be distributed pro rata to claimants in lieu of punitive damages, which are not otherwise available under the Plan.

A proposed Disclosure Statement was presented to the court, and following a hearing on March 21, 1988 the court approved the Disclosure Statement as containing adequate information as defined in § 1125 of the Bankruptcy Code. In late April Robins mailed to all Dalkon Shield claimants, creditors and equity security holders the following:

(a) The Disclosure Statement, (b) the Plan of Reorganization, (c) the Notice of Hearing on (i) Confirmation of the Debtor's Plan of Reorganization, (ii) Debtor's Request for Disallowance of Punitive Damages, and (iii) other matters set forth in § 7.02(a) of Debtor's Plan of Reorganization, (d) the Disclosure Statement Order, (e) the court's order of March 21, 1988 Temporarily Allowing and Estimating Dalkon Shield Claims for Voting Purposes Only, (f) letters from the United States District Court, the Official Committee of Dalkon Shield Claimants, Robins, the Official Unsecured Creditors' Committee and Counsel for the Official Committee of Equity Security Holders, and (g) ballots for the purpose of voting to accept or reject the Plan.

Thereafter, the Plan was overwhelmingly approved by the creditors and security holders whose acceptance is required by law.

Thereafter certain amendments were made to the Claimants' Trust, which the district court found did not require a resubmission to and another vote by the creditors, claimants and equity holders. One amendment was the immediate payment by Robins to the Claimants' Trust of $100,000,000 within thirty days after the entry of the confirmation order. These funds were to fund administrative expenses of the Trust, to prepare for distributions to be made from the Trust, and to pay Claims pursuant to Option 1 of the Claims Resolution Facility and Dalkon Shield liquidated claims.

On July 26, 1988, the district court filed its Confirmation Order and a 32 page Memorandum In Re Confirmation Order. Cer-

tain findings and conclusions in this order are one question in the present appeal. In approving the "feasibility" of the Plan under § 1129 of the Bankruptcy Code, the Court stated:

A fair reading of the Plan discloses that the feasibility of same is premised on continuing supervision by the Court of each of the Trusts. Feasibility of this Plan and the law requires this supervision to assure the accuracy of the Court's estimate, the full payment of all Dalkon Shield personal injury claims and allowed Dalkon Shield liquidated claims and to reduce the threat of personal liability of the Trustees and personnel of the Trusts. After the Trusts are established, the Trusts will operate independently of Robins and the duties of the Official Committee of Dalkon Shield Claimants and of the Future Claimants' Representative will have terminated except with respect to appeals, fee applications, and matters related to proposed modifications of the Plan. Under these circumstances, supervision of the Trust by the Court is necessary and appropriate. Court supervision of the Trusts is sufficient under the facts of this case in that the Court is empowered under the law to approve all payments by the Trusts for services, costs and expenses in connection with the administration of the Trusts and to approve the employment by the Trusts of professionals and administrators, and otherwise to supervise the Trusts as provided for or allowed by the Plan and applicable law.

Sections 105, 1129(a)(4) and 1142 of the Bankruptcy Code and Sections 157 and 1334 of Title 28 of the United States Code as well as principles of equity empower and require the Court to maintain a continuing supervision in the manner aforesaid.

Additionally, the Court's supervision of the Trusts is consistent with the Plan and the Trusts. Section 3.03(c) of the Claimants' Trust empowers the Court to remove Trustees of the Claimants' Trust without a showing of cause. Section 3.04(a) of the Claimants' Trust empowers the Court to appoint a successor Trustee of its own nomination if the remaining Trustees fail to nominate a successor Trustee that is approved by the Court within 60 days after the death, resignation, incapacity to serve or removal of a Trustee prior to the expiration of his or her term. Section 4.03(a) of the Claimants' Trust provides that the Trustees are empowered to take actions pursuant to the Confirmation Order. Both Trusts require the filing of financial accountings with the Court. Section 8.05 of the Plan provides for broad retention of jurisdiction and although it does not include jurisdiction of the day-to-day operations of the Trusts. The supervision by the Court of payments for services or for costs and expenses in connection with the administration of the Trusts and of the employment by the Trusts of professionals and administrators is not supervision of the day-to-day operations of the Trusts.

(Pages 23–25 Memorandum In Re Confirmation Order).

The Plan at § 8.05 provides for retention of jurisdiction by the district court

Retention of Jurisdiction. Notwithstanding entry of the Confirmation Order or the Consummation Date having occurred, the Court will retain jurisdiction (a) to determine any Disputed Claims (other than Dalkon Shield Personal Injury Claims and Dalkon Shield Other Claims), except as provided in the Trust Agreements, (b) to determine requests for payment of Claims entitled to priority under section 507(a)(1) of the Code, including compensation of and reimbursement of expenses of parties entitled thereto, (c) to resolve controversies and disputes regarding interpretation and implementation of the Plan, the Trust Agreements, the Claims Resolution Facility, and releases obtained by the Trusts (or either of them), and amendments of the Trust Agreements, and, in accordance with the provisions of the Claims Resolution Facility, any disputes relating to whether or not a timely and proper notice of claim was filed or whether a Disallowed Claim should be reinstated, (d) to enter orders

in aid of the Plan, the Trust Agreements, the Claims Resolution Facility, and releases obtained by the Trusts (or either of them), including, without limitation, appropriate orders (which may include contempt or other sanctions) to protect the Debtor, the Successor Corporation, AHP, any of the Affiliates thereof, and other Persons from actions prohibited under Article VIII of the Plan, (e) to modify the Plan pursuant to Section 9.06 of the Plan, (f) to determine any and all applications, Claims, adversary proceedings and contested or litigated matters pending on the Consummation Date, (g) to allow, disallow, estimate, liquidate or determine any Claim (excluding Dalkon Shield Claims) against the Debtor and to enter or enforce any order requiring the filing of any such Claim before a particular date, (h) to determine any and all pending applications for the rejection or disaffirmance of executory contracts or leases, and to hear and determine, and if need be to liquidate, any and all Claims arising therefrom, (i) over actions challenging the validity and enforceability of the releases and injunctions referred to in Sections 8.03 and 8.04 of the Plan, and (j) to enter a final decree closing the Case; provided, however, that nothing contained in this Section 8.05 is intended to confer jurisdiction upon the Court over, or grant authority to monitor, the day-to-day operations of the Trusts or the Claims Resolution Facility.

The Claimants' Trust Agreement has several references to action by the Court. The first of these is § 3.03(c) which provides:

A Trustee may be removed from office by the Court upon its own motion, the motion of any Trustee, or the motion of at least 100 Beneficiaries represented by at least five independent and unaffiliated attorneys and a determination by the Court that such removal is appropriate upon good cause shown.

Section 3.04 provides:

Appointment of Successor Trustees.

(a) In the event of the death, resignation, incapacity to serve as determined by the Court or removal of a Trustee prior to the expiration of his or her term, a Successor Trustee shall be nominated by the remaining Trustees, subject to court approval, within 60 days after such death, resignation or removal. If the remaining Trustees fail to nominate a successor Trustee that is approved by the Court within such 60 day period, a successor Trustee may be appointed by the Court.

At § 3.06 of the Trust it is provided: Compensation and Expenses of Trustees. Each Trustee shall receive as compensation for his or her services a monthly fee at the rate of $35,000 per year and a meeting fee at a rate of $1,000 per day. This compensation may be adjusted from time to time by action of the Trustees, subject to approval of the Court. In addition, each Trustee shall be reimbursed for his or her reasonable expenses, as determined by a majority of the other Trustees, incurred in the performance of his or her duties.

Under § 6.07 of the Trust it is provided that the laws of Virginia shall govern the interpretation, validity, management, administration and investment of the Trust. Section 6.08 requires the Trust to maintain its principal offices in Richmond.

Barbara B. Blum, Kenneth R. Feinberg, Gene Locks, Stephen A. Saltzburg and Ann E. Samani were appointed as Trustees of the Claimants' Trust, and under its terms they serve without bond. These Trustees together with Robins executed the Trust Agreement.

Throughout the negotiations leading to adoption of the plan, the district court expressed a desire that valid Dalkon Shield Claims be paid as quickly as possible. The Court was concerned that many claims were liquidated in amount because they were the result of judgments obtained by claimants in civil actions brought against Robins prior to its bankruptcy. At the court's insistence, the amount of the start up payment, provided by § 6.07 of the Plan, was increased from $10 million to $100 million. This amount was paid to the Trustees 30 days after confirmation of the Plan. This sum is to be used "to fund

administrative expenses of the Trust, to prepare for distributions to be made from the Trust, and to pay claims pursuant to Option 1 of the Claims Resolution Facility and Dalkon Shield Liquidated Claims."

When Robins went into bankruptcy, the court advertised worldwide and gave notice to possible claimants of the bankruptcy and of the necessity to file a claim against the company in bankruptcy. As a result several hundred thousand claims were filed and it was necessary for the court to establish in Richmond a records and computer facility to deal with these claims. This facility was under the supervision of Michael Sheppard, who was then serving as clerk of the United States Bankruptcy Court for the Eastern District of Virginia. Prior to confirmation of the plan, Robins bore the expenses of this facility, but when the plan was confirmed it was necessary to transfer the records facility to the Trust. Since there was a delay in funding the trust for thirty days after confirmation, and the maintenance of the facility was essential to an orderly administration of claims, the district court ordered Robins to immediately pay $200,000 into the registry of the court and directed that these funds be deposited in Dominion Bank in an interest bearing account and credited against Robins' $100 million start-up payment. These funds were to be disbursed with court approval.

The records facility went through a difficult time when employees of the clerk's office were withdrawn and the Trustees had not decided whether to take over, maintain and use the records facility in discharging their duties under the Trust. After some delay the Trustees did take over the records facility and employed Mr. Sheppard as director of the facility at an annual salary of $150,000. In the interim before the Trustees took over the records facility, the district court directed the clerk of the bankruptcy court to maintain the facility and to disburse funds from the $200,000 Robins advance to keep the facility open and operating. At the time the facility was getting numerous daily telephone calls and hundreds of letters a week from claimants seeking information. It was also the repository of all of the information about the Dalkon Shield claimants.

In early August 1988 the Trustees provisionally retained the law firm of Cadwalader, Wickersham & Taft as counsel for the Trust. This firm had represented and still represents the Claimants' Committee. Shortly thereafter the Equity Security Holders' Committee sought to enjoin the $100 million start-up payment or to enjoin the Trust from disbursing funds pending an investigation into the possible conflict of interest in having the Cadwalader firm represent the Trust. By order of August 25, 1988 the district court denied the motion to enjoin the payment of the start-up funds and directed Robins to pay these funds to the Clerk of the bankruptcy court and directed that they be invested in short-term government securities for the benefit of the Dalkon Shield Claimants' Trust through federally insured banks. The court temporarily enjoined the Cadwalader law firm from rendering any legal services or advice to the Trustees.

The issue of a possible conflict of interest, if the Cadwalader firm represented the Trust, was referred to the Honorable Albert V. Bryan, Jr., Chief Judge of the United States District Court for the Eastern District of Virginia, and after a hearing Judge Bryan filed his order of September 27, 1988 permanently enjoining Cadwalader, Wickersham & Taft from accepting employment as counsel for the Claimants' Trust.

On September 22, 1988, the Dalkon Shield Claimants' Committee, through its attorneys Cadwalader, Wickersham & Taft, filed a motion for emergency relief asking this court to enjoin the district court from "interfering in the operation of the Trust." The Claimants' Committee asserts that actions of the district court have compromised the independence of the Trustees of the Claimants' Trust by the following actions:

(a) Ordering that $200,000 for initial operating expenses be paid to the registry of the court;

(b) Ordering that trade accounts be paid from that $200,000;

(c) Ordering that the $100 million start-up payment required by the Plan to be paid to the Trust be paid into the registry of the court at Dominion Bank;

(d) Ordering the $100 million deposited to the registry of the court at Dominion Bank be transferred to an operating account of the Trust at Crestar Bank;

(e) Delivering to the Trustees its draft of a letter for them to send to claimants regarding Option 1 for claims resolutions, and setting the amount of $750 for Option 1; and

(f) Encouraging the Trustees to employ the clerk of the bankruptcy court in this matter at a salary of $150,000 per year, plus benefits, for three years.

Robins filed a motion to dismiss the motion for emergency relief upon the grounds that there was no actual case or controversy and the Claimants' Committee lacked standing to pursue the matter if there was a case. This motion was taken under advisement pending briefing and oral argument.

The Trustees of the Claimants' Trust filed a statement on September 29, 1988 in response to the emergency motion and stated:

The Trustees reject any suggestion that the district court or anyone else is interfering in the operation of the Trust and, specifically, reject any implication that the Trustees' decisions are not made fully consonant with their individual and collective fiduciary responsibility.

We heard oral arguments on the Motion for Emergency Relief on October 4, 1988, and we treated it as a motion for an injunction pending appeal and denied it. We expressed no opinion as to the merits of the appeal. The appeal was fully briefed and oral arguments were heard December 6, 1988.

The present complaint by the Claimants' Committee of alleged improper actions by the district court is supported only by an affidavit of the Committees' Counsel. This affidavit alleges that the district court's supervision has interfered with the Trustees, injured the Claimants' Trust and amounted to monitoring the day-to-day operations of the Trust in violation of the bankruptcy law and § 8.05 of the Plan. These claims were specifically refuted by the sworn testimony of the Trustees.

II

Robins asserts that the Claimants' Committee lacks standing to assert all of its present claims because all of these claims relate to interference with the Trustees in the exercise of their duties, and such a claim would belong to the Trustees and not to the Claimants' Committee. In *Heckler v. Mathews*, 465 U.S. 728, 738, 104 S.Ct. 1387, 1394, 79 L.Ed.2d 646 (1984) the court explained:

In order to establish standing for purposes of the constitutional "case or controversy" requirement, a plaintiff must show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.

In the present action the Claimants' Committee is contesting certain language of the Memorandum In Re Confirmation Order of July 26, 1988 that it contends is inconsistent with the language of the Plan and is beyond the power of the court. If the district court has erred, as claimed, in asserting powers that it does not possess, and in effect has amended the clear intent and language of the Plan by the language of its July 26, 1988 order, the persons having claims against the Trust could be injured or threatened with injury. In like manner, the claimants could be injured if the court usurps the powers and duties of the Trustees to the extent that their actions are impaired and the efficiency of the Claims Resolution Facility is harmed.

We conclude there is a case or controversy and that the language of 11 U.S.C.

1109(b) is sufficient to provide the Claimants' Committee with standing. This section provides:

A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter.

### III

■ In the Memorandum In Re Confirmation Order, the district court found that for the Plan to be feasible, as required by the Bankruptcy Act, the law required that there be continuing supervision by the district court of each of the Trusts created as a part of the Plan. The Claimants' Committee cites cases which hold that "feasibility" relates solely to whether the debtor will be able to perform its obligations under the plan of reorganization, and the standard is the reorganized debtor's prospects for economic viability. *See United Properties Inc. v. Emporium Dep't Stores, Inc.*, 379 F.2d 55, 64 (8th Cir.1967); *In re Prudential Energy Co.*, 58 B.R. 857, 862–63 (Bankr.S.D.N.Y.1986); *In re Adamson Co., Inc.*, 42 B.R. 169, 174 (Bankr.E.D. Va.1984); *In re Merrimack Valley Oil Co., Inc.*, 32 B.R. 485, 488 (Bankr.D.Mass.1983).

The Claimants' Committee also directs our attention to authority that holds that the court's post-confirmation jurisdiction is provided by the Plan of reorganization itself, and the Plan is the charter for any post-confirmation jurisdiction. *Allied Technology, Inc. v. R.B. Brunemann & Sons, Inc.*, 25 B.R. 484, 499 (Bankr.S.D. Ohio 1982). These authorities are not applicable to the present facts and do not impress us because none of them deal with a factual or financial problem in any way similar to the Robins reorganization and its creation of the Claimants' Trust and the Claims Resolution Facility. The presence of almost 200,000 claims and the Trust with assets of almost $2.3 billion make this case unique. Under these circumstances and

under the language of the Trust and the Plan, and under the law of Virginia, the district court's finding in its Memorandum In Re Confirmation Order, that continuing supervision of each of the Trusts is required, is correct so long as its supervision does not interfere with the day-to-day operation of the Trust.

■ Under § 6.07 of the Trust it is provided that the laws of Virginia shall govern the interpretation, validity, management, administration and investment of the Trust. Matters relating to the control and supervision of trusts are within the equity jurisdiction of the court, and the power of the court of equity is usually invoked to require a trustee to perform a duty under a Trust. *Schroeder v. Woodward*, 116 Va. 506, 82 S.E. 192, 199 (1914). In *Moore v. Downham*, 166 Va. 77, 184 S.E. 199, 200–01 (1936), the court held that courts of equity have authority to supervise all trusts. *See also* 19 *Michie's Jurisprudence*, Trusts and Trustees, § 129, at 206.

The district court in its Memorandum In Re Confirmation Order sets forth its claim of the power of continuing supervision of the Trust, and its foundation for this claim is the language of the Plan and the Trust, and §§ 105, 1129(a)(4) and 1142 of the Bankruptcy Code, 11 U.S.C. §§ 105, 1129(a)(4) and 1142 and 28 U.S.C. §§ 157 and 1334. It is apparent from the language of the Plan and the Trust that the court has certain powers and responsibilities after confirmation of the Plan and during the life of the Trust. A list of these powers and references to the specific articles and sections of the Plan and the Trusts have been detailed above. It is not necessary for us to examine each of these sources. Sections 157 and 1334 of Chapter 28 of the United States Code authorize district courts to take certain actions in bankruptcy cases. Section 105 of the Bankruptcy Code authorizes the court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title. . . ." It is a source of the equity powers of the court. These

equity powers are not without limit as we found in *Official Committee of Equity Security Holders v. Mabey*, 832 F.2d 299, 302 (4th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1228, 99 L.Ed.2d 428 (1988), when we quoted with approval the language from *In the Matter of Chicago, Milwaukee, St. Paul and Pacific Railroad Company, Debtor,* 791 F.2d 524, 528 (7th Cir. 1986), which stated:

> [t]he fact that a proceeding is equitable does not give the judge a free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness, however enlightened those views may be.

■ In the present case we are not required to discuss the outer limits of the equitable powers of the court under § 105 or the trust laws of Virginia because we conclude that the challenged actions of the district court do not exceed its powers and do not amount to monitoring the day-to-day operations of the Trusts or result in usurpation of or interference with the powers and duties of the Trustees.

The Claimants' Committee enumerates six actions of the district court and asserts that the court lacked the power to take such actions, and that these acts were an interference with the day-to-day operation of the Trust and with the management authority and responsibility of the Trustees. The actions of the district court were all taken in an effort to expedite the payment of Dalkon Shield claims. These actions did not involve the day-to-day operation or administration of the Trust but were efforts to get the Trustees and the Claims Resolution Facility operating with a minimum of delay. These acts did not interfere with the Trustees in the performance of their duties, but according to the Trustees, assisted them in getting things started.

The Committee complains of the district court ordering $200,000 to be advanced by Robins to cover initial operating expenses, and of the deposit of these funds into the registry of the court in Dominion Bank, and later the Committee complains of the district court ordering the balance of this advance transferred from Dominion Bank to Crestar Bank. This $200,000 advance was a part of the $100 million that Robins was to pay to the Claimants' Trust within thirty days after the entry of the consummation order. Since there was a thirty day delay in the payment of the full amount, and there was a great need to continue to pay the expenses of the Records and Computer Facility and to pay its employees, who would no longer be paid by Robins, the district court acted wisely and in the best interest of all claimants, and with the approval of the Trustees in taking this action.

It was necessary that it put the money into the registry of the court because at that time the Trustees had not established a banking connection. Current operating expenses were paid out of this account until the Trustees established a bank account for the Trust at Crestar Bank. The court then ordered the balance of this account transferred from the registry of the court account at Dominion to the Trustees' account at Crestar.

The Committee also complains of the court ordering the $100 million start-up payment from Robins to be paid into the registry of the court rather than directly to the Trustees. When this amount became due from Robins thirty days after the confirmation of the Plan, a dispute had arisen about the selection of the Cadwalader law firm as counsel for the Trustees and the court had directed the Examiner to conduct an investigation and the Equity Security Holders' Committee had brought an action to enjoin the payment of the $100 million. Not wishing to delay the payment of this very large advance and to lose the interest it would earn for the Trust, the court directed that Robins immediately pay the $100 million to the Clerk of the Bankruptcy Court and that the funds be invested, through federally insured banks, in short term government securities for the benefit of the Dalkon Shield Trust. Several weeks later the court ordered that this fund plus

accumulated interest be transferred from the registry of the court to the Trustees' account at the Crestar Bank. The funds were then available to pay the outstanding judgments of Dalkon Shield claimants, who had obtained jury verdicts or had agreed upon settlements prior to the bankruptcy, and whose claims were stayed by the bankruptcy action.

The Committee has also complained about the use of Crestar Bank rather than Bankers Trust of New York City and asserts that this resulted in a loss of interest to the Trust. This allegation was answered by the testimony of the Trustees that their arrangement with Crestar Bank is equal to and probably better than the offer made by Bankers Trust.

The Committee also asserts that the delivery to the Trustees of a draft of a notice and other materials to be sent to the claimants regarding Option 1 for claims resolution, and setting the amount at $750 for Option 1 were improper acts of the court and interfered with the Trustees' discharge of their duties. The testimony clearly shows that the Trustees had solicited the court's assistance in the formulation of Option 1 and in the preparation of the notice and other forms that would accompany Option 1 when it was mailed out to claimants. Again, the testimony shows that the court's efforts were directed at expediting the payment of valid claims of Dalkon Shield claimants and its assistance had been solicited by the Trustees.

The next claim of interference is the assertion that the court unduly encouraged the Trustees to employ the Clerk of the Bankruptcy Court at a salary of $150,000 per year, plus benefits, for a period of three years. The record is clear that the Clerk of the Bankruptcy court had for more than three years supervised the records center and had been intimately involved in the worldwide notification of claimants and in keeping the records of several hundred thousand claims submitted. There seems little doubt that this man was the best qualified to assist the Trustees in their difficult task. The negotiations regarding his terms of employment were all accomplished by the Trustees.

We agree with the Claimants' Committee that the district court was in error when it stated in the Memorandum In Re Confirmation Order: "Section 3.03(c) of the Claimants' Trust empowered the Court to remove Trustees of the Claimants' Trust without a showing of cause." At Section 3.03(c) the Trust Agreement states:

[a] Trustee may be removed from office by the Court upon its own motion, the motion of any Trustee, or the motion of at least 100 beneficiaries represented by at least 5 independent and unaffiliated attorneys and a determination by the Court that such removal is appropriate *upon good cause shown.* (Emphasis added).

However, when the Court first faced the issue of the removal of Trustees in its November 28, 1988 order, it stated: "In the instant case the Trust Agreement mandates a good cause standard for the removal of Trustees". Therefore, any error or misunderstanding on this point as set forth in the order of July 26, 1988 is rectified in the order of November 28, 1988.

For the foregoing reasons the Motion for Emergency Relief is denied.

AFFIRMED.